IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS
and OREGON WILD,

        Plaintiffs,

    v.

UNITED STATES FOREST SERVICE,
an administrative agency of
the United States Department
of Agriculture,

        Defendant,

    v.

FRERES LUMBER COMPANY, INC.,
an Oregon corporation, and
SENECA SAWMILL COMPANY, an
Oregon corporation.

        Defendant-
        Intervenors.

Case No. 6:12-cv-00804-AA
OPINION AND ORDER

_____

Susan Jane M. Brown
Western Environmental Law Center
4107 NE Couch Street
Portland, Oregon 97232

John R. Mellgren
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
    Attorneys for plaintiffs

Page 1 - OPINION AND ORDER

S. Amanda Marshall
United States Attorney
Sean E. Martin
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
    Attorneys for defendant

Scott W. Horngren
American Forest Resource Council
5100 S.W. Macadam, Suite 350
Portland, Oregon 97239
    Attorney for defendant-intervenors

AIKEN, Chief Judge:

    Plaintiffs Cascadia Wildlands and Oregon Wild move for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant United States Forest Service ("Forest Service") and defendant-intervenors Freres Lumber Company, Inc. ("Freres") and Seneca Sawmill Company ("Seneca")[1] each filed cross-motions for summary judgment. For the reasons set forth below, the parties' motions are granted in part and denied in part.

## BACKGROUND

    This case involves a challenge to the Forest Service's authorization of the Goose Project ("Project") located in the McKenzie Ranger District of the Willamette National Forest ("WNF") near the community of McKenzie Bridge. Administrative Record ("AR") 13433. This region falls under the purview of the Northwest Forest Plan ("NFP"), which coordinates federal efforts to balance environmental concerns with the need for sustainable forest

---

[1] Defendant-intervenors' arguments in favor of summary judgment are analogous to those asserted by the Forest Service. Accordingly, except where otherwise indicated, the Court will address defendant-intervenors' and the Forest Service's motions together.

Page 2 - OPINION AND ORDER

products within the range of the northern spotted owl.[2]  See
Supplemental Record ("SAR") 001-083.  The NFP developed a number of
Standards and Guidelines ("SG"), directing the agencies' enactment
of the NFP by allocating lands for various uses and providing
outcome objectives.[3]  See SAR 084-237.  Included in the SG is the
Aquatic Conservation Strategy ("ACS"), which "was developed to
restore and maintain the ecological health of watersheds and
aquatic ecosystems contained within them on public lands."  SAR
109.

Working within this framework, the Forest Service developed
the Goose Project.  The Forest Service's stated purpose for the
Project is threefold: "1) Actively manage stands to improve stand
conditions, diversity, density, and structure, 2) Reduce hazardous
fuel levels in the McKenzie Bridge Wildland-Urban Interface
("WUI"), and 3) Provide for a sustainable supply of timber products
within the Goose Project boundary." AR 13435.

To these ends, the Project would permit commercial harvest of
approximately 2,100 acres of public lands in the WNF through
commercial thinning (1,255 acres), early seral wildlife thinning

---

[2]The NFP Record of Decision was adopted in 1994 and covers
24.5 million acres of land managed by the Forest Service and the
Bureau of Land Management in Washington, Oregon, and northern
California.

[3]The goal of the SG is to "maintain a healthy forest
ecosystem with habitat that will support populations of native
species...including protection for riparian areas and waters; and
maintain a sustainable supply of timber and other forest products
that will help maintain the stability of local and regional
economies on a predictable and long-term basis."  SAR 094.  The
SG allocates the lands under the NFP into one of seven different
designations, each with its own authorized uses and practices.

(195 acres), skip and gap creation (598 acres), dominant tree and sugar pine release (11 acres), and regeneration harvest treatments (41 acres).[4]    AR 13438.    In addition, the Project authorizes noncommercial hazardous fuels reduction treatments[5] of approximately 668 acres through noncommercial thinning and natural fuels underburning in the WUI.  AR 13437.

At issue with the Project are the loss and downgrade of habitat for the northern spotted owl, regeneration harvests within Riparian Reserves, the loss of potential wilderness from the Lookout Mountain Potential Wilderness Area ("PWA"), and the extent of road construction. Specifically, the Project authorizes 454 acres of removal or downgrade of northern spotted owl habitat.  AR 15286.  In Riparian Reserves, it includes 362 acres of commercial

---

[4]The Forest Service noted significant public concern over the "regeneration harvest" and explained:

Regeneration harvest should not be considered synonymous with "clearcuts" as seen on private lands... The regeneration harvest units will leave more than the minimum retention required by the NWFP... The treatments post harvest will be more like a shelterwood or seed harvest with both scattered and clumped residual trees left.  This will allow for at least a two aged stand to develop into the future giving the stand more complex habitat structure.  The increased habitat structure is an attempt to get a timber commodity out of the stand while still preserving some late successional characteristics that can possibly be utilized by late successional species in the future (>50 years).  AR 15238.

[5]The Forest Service has noted the importance of reducing the wildfire fuels in the McKenzie Wildland-Urban Interface ("WUI"). The Forest Service further asserts that the current fuel loadings (downed woody material available as fuel for a wildfire) are "projected to be above" current WNF Land and Resource Management Plan's Standards and Guidelines. AR 13447-48, AR 13549.

thinning and an additional 582 acres slated for fuels treatment.[6] AR 13478.  Also included in the proposed Project are 365 acres of fire-regenerated stands more than 80 years old.  AR 15237.  The Project authorizes one mile of permanent road construction, eight miles of temporary road construction, and 43 miles of road maintenance.  AR 15236.  Additionally, the project would result in 680 acres of PWA lost through harvest and fuels reduction and 569 acres lost through fragmentation.  AR 13518.  In total, the Lookout Mountain PWA would lose 1,249 acres of its 9,684 acres of potential wilderness.  Id.

On June 2, 2009, the Forest Service conducted a public field trip in an effort to gather public opinion on potential forest management activities.  AR 2404.  In August 2009, the Forest Service prepared a Biological Assessment ("BA") to analyze the effects of various proposed federal actions on the northern spotted owl and its habitat.  AR 2664-2780.  Further, the Forest Service formally consulted with the Fish and Wildlife Service ("FWS") in September 2009 to analyze specific effects of the Project on the spotted owl.  AR 4822.  The resulting Biological Opinion ("BiOp"), issued by the FWS, determined that while the Project would likely adversely affect specific owls, the Project would not further threaten the species' continued existence.  AR 4934-36.

On October 1, 2009, the Forest Service listed the Project in

---

[6] The Forest Service's discussion of the fuels treatment in Riparian Reserves states that the "net result would be increased plant species and stand structural diversity, with a closer resemblance to historic stand condition than non-thinned plantations."  AR 13479.

Page 5 - OPINION AND ORDER

the Schedule of Proposed Actions. AR 15234. The Forest Service mailed postcards to the public on November 16, 2009, requesting scoping comments on the project by December 7, 2009. Id.

On June 23, 2010, the Forest Service published an Environmental Assessment ("EA") of the Goose Project. The EA included references to both the BiOp and the BA. See, e.g., AR 13554, 13555. Following a review of the comments received in response to the EA, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("FONSI") on September 13, 2010. AR 15232-86. The decision approved the Project with only minor modifications.[7]

In November 2010, plaintiffs challenged the Project via administrative protest. AR 15435-42. On December 16, 2010, the Forest Service responded to these protests and denied plaintiffs' appeal. AR 15456-64.

After exhausting their administrative remedies, plaintiffs filed a complaint in this Court, alleging that both the 2010 EA and FONSI violate the National Environmental Policy Act ("NEPA"). Plaintiffs maintain that the EA failed to disclose environmental information and consequences of the Goose Project on both the northern spotted owl habitat and the affected Riparian Reserves. Plaintiffs further contend that the proposed actions trigger NEPA's

---

[7] The Forest Service noted that all modifications were "within the range of effects analyzed in the EA" and included a no-harvest buffer to protect a maple grove in unit 420, a no-harvest buffer around a "special interest area" in unit 380, and a provision against cutting any tree greater than 36" in diameter within 350 feet of a private residential boundary. AR 15235.

requirement that the Forest Service prepare an Environmental Impact Statement ("EIS").

## STANDARD OF REVIEW

A federal agency's compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under the APA, a final agency action may be set aside if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). A decision is not arbitrary or capricious if the federal agency articulated a rational connection between the facts found and the choice made. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

Review under this standard is narrow, and the court may not substitute its judgment for that of the agency. Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d 569, 573 (9th Cir. 1988). Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review." Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

**DISCUSSION**

Plaintiffs assert that the Forest Service's authorization of the Goose Project violated NEPA's procedural requirements by failing to disclose consequences of the Project and by failing to prepare an EIS for the Project.   Initially, plaintiffs argued that the Forest Service violated NEPA in four ways; however, as both parties now concede that a recent ruling from the Ninth Circuit Court of Appeals foreclosed two of those arguments, this Court will not address them here.   See Pls.' Reply Mem. in Supp. of Mot. Summ. J. 15, Def.'s  Mem. in Supp. of Mot. Summ. 26; Earth Island Inst. v. U.S. Forest Serv., 697 F.3d, 1010, 1020 (9th Cir. 2012)(holding that an agency does not have an obligation to respond directly to opposing scientific viewpoints in the body of an EA).

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  Sierra Club v. Bosworth ("Sierra Club I"), 510 F.3d 1016, 1018 (9th Cir. 2007) (citation and internal quotations omitted).  To accomplish the "hard look" requirement, NEPA requires all agencies to prepare an environmental impact statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

The agency first prepares an EA to determine whether an action will be significant; if the agency concludes there is no significant effect associated with the proposed action, it may issue a FONSI, "accompanied by a convincing statement of reasons to

explain why a project's impacts are insignificant" in lieu of preparing an EIS. Sierra Club I, 510 F.3d at 1018 (citation and internal quotations omitted); 40 C.F.R. § 1508.9. Thus, an EA "need not be extensive." Grand Canyon Trust v. U.S. Bureau of Reclamation, 623 F. Supp. 2d 1015, 1026 (D. Ariz. 2009).

I.   First NEPA Claim: Failure to Disclose Environmental Information

Plaintiffs first contend that the Forest Service violated NEPA by failing to disclose 1) environmental information about the habitat competition between the spotted owl and the barred owl, and 2) consequences of logging in critical Riparian Reserves. Specifically, plaintiffs argue that the limited discussion of the interspecies competition between barred owls and northern spotted owls in the BA and BiOp did not satisfy NEPA's requirements. Further, plaintiffs claim that the Forest Service's analysis of logging in Riparian Reserves failed to demonstrate why it was a necessary part of the Project.

A.   EA Requirements

An EA is a "concise public document" that provides an agency's analysis of proposed action. 40 C.F.R. § 1508.9(a). The EA "shall include brief discussions of the need for the proposal, of alternatives [to the proposed action], of the environmental impacts of the proposed action and alternatives, and a listing of the agencies and persons consulted." Id. at § 1508.9(b). Federal regulations authorize the agencies to incorporate additional scientific data and documents by reference into the NEPA documents "when the effect will be to cut down on bulk without impeding

Page 9 - OPINION AND ORDER

agency and public review of the action." Id. at § 1502.21 (EIS, Incorporation by Reference); 36 C.F.R. § 220.4(h) ("Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described...").

B.  Analysis

Between 2009 and 2010, the Forest Service evaluated the environmental impacts of the Project resulting in the 2010 EA.  AR 13428-557.  As a part of its evaluation, the Forest Service consulted with the FWS regarding the spotted owl and the FWS submitted a BiOp; these conclusions and recommendations were included in the Forest Service's EA.  AR 13494-98.  Further, the Forest Service discusses the effects of the Project, as well as a no action alternative, on the Riparian Reserves within the project area.  AR 13477-79.

i.  Failure to Disclose Information Regarding Barred Owl/Northern Spotted Owl Habitat Competition

Plaintiffs maintain that the EA failed to discuss or disclose the Project's effect on interspecies competition between the northern spotted owl and the barred owl, and that any discussion of this competition in the BA and BiOp did not satisfy NEPA's disclosure requirement and was not readily available to the public for review. Plaintiffs emphasize NEPA's fundamental purpose of "foster[ing] better decision making and informed public participation for actions that affect the environment." Or. Natural Res. Council Action v. U.S. Forest Serv., 293 F. Supp. 2d 1200, 1204 (D. Or. 2003).  They argue that the Forest Service

Page 10 - OPINION AND ORDER

failed in its duty to the public - and its requirement under NEPA - to operate with transparency in its decision-making process.  This argument is without merit.

Contrary to the plaintiff's assertion, the Forest Service clearly referenced and identified the BA and the BiOp, including the dates the BA was submitted and the official BiOp number. See, e.g., AR 13494 (noting that the project-specific effects were addressed in the BA and the Forest Service consulted with the FWS on the BiOp).  Both the EA and the FONSI contain sections discussing the effects of the Project on the habitat of the spotted owl. See, e.g., AR 13494-98, AR 15244.  Further, the cover page of the EA provided full contact information for Kurt Steele, the Project leader, advising interested parties to contact Mr. Steele for additional information.  AR 13427.  In its responses to the scoping comments on the EA, the Forest Service noted when more comprehensive information could be found in the BA or BiOp "located in the project file." See, e.g., AR 13554, 13555.  This frequent reference to items in the Project file, coupled with access to the Project leader, indicates the Forest Service's willingness to provide additional information.  Rather than keeping its analysis from the light of day, as plaintiffs suggest, the record shows the Forest Service's attempt to keep the EA concise, supplying extended analyses on request.

Plaintiffs further assert that these cursory mentions of the BA and BiOp in the EA and FONSI did not take the requisite "hard look" at the specific impact of the Project on habitat competition

Page 11 - OPINION AND ORDER

between the owls.  The bulk of the analysis, plaintiffs contend, took place in the BA and was not included in the EA.  Plaintiffs cite Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012) to support their position that incorporation by reference is not appropriate in this case.  There, the Ninth Circuit found that the Forest Service's EA did not provide any analysis of the environmental consequences to individual fish species resulting from a significant change to an existing forest plan.  Instead, the EA incorporated by reference the BAs previously used for the forest plan, without undertaking any new analysis of the substantial change.  Id. at 1028.  Plaintiffs assert that Pacific Rivers renders incorporation by reference inappropriate where, as here, the BA is meant to "serve as the analysis of the environmental consequences of the proposed action."  Id. at 1031, Pls.' Reply Mem. in Supp. of Mot. Summ. J. 8.  This Court is not persuaded that this case is analogous.

Unlike Pacific Rivers, the Forest Service here undertook an analysis of the consequences of the Project on the northern spotted owl and relied on a BA that also analyzed the effect of the Project.  As required by the Endangered Species Act, the Forest Service further consulted with the FWS to prepare a BiOp to analyze the effects of the Project on the northern spotted owl.  16 U.S.C. § 1531 et seq.  Both the EA and the FONSI explain project-specific potential consequences and include references to the more detailed BA and BiOp, which discuss the interspecies competition for habitat.  The EA notes that the proposed logging would likely

Page 12 - OPINION AND ORDER

adversely affect individual northern spotted owls, but would not jeopardize the continued existence of the species. AR 13495. The FONSI includes similar information, as well as the mitigation efforts included in the plan and responses to public comments on the potential effects. AR 15244, AR 15251, AR 15260, AR 15272-74.

Moreover, NEPA regulations only "direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1010-11 (9th Cir. 2006) (citation omitted). That is precisely what occurred in this case. Further, the FWS reported that the Project would have repercussions on individual nest sites, and the EA and FONSI clearly disclose these findings. AR 13494-98, AR 15244.

Nonetheless, plaintiffs maintain that the EA must include a thorough analysis of how the authorized logging would affect habitat competition between the two owl species, arguing that the Forest Service has chosen to avoid a significant issue with the Project. However, courts are not required to "order the agency to explain every possible scientific uncertainty." Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008)(en banc).

Moreover, the Forest Service discloses the same uncertainty regarding the interspecies competition, noting in the BA, "[i]t is also clear that, in some portions of the northern spotted owl's range, barred owls are increasing and spotted owls are declining to some degree independently of forest management." AR 2763. In its BiOp, the FWS also discusses the significant amount of uncertainty

Page 13 - OPINION AND ORDER

regarding the effects of forest management on habitat competition between the owls, ultimately concluding "that the NFP in concert with the guidelines from the Northern Spotted Owl Recovery Plan still provides the backbone of the federal contribution to spotted owl recovery even with the uncertainty surrounding the effect of the barred owls on spotted owls." AR 4861.

Defendants point to NEPA's requirement that documents "concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b). Here, the Forest Service described in detail the potential consequences of the Project to the northern spotted owl and incorporated the BA and BiOp that were prepared to assess the effects of the Project on the threatened species. The EA described the potential harm to three nesting sites due to habitat removal and harassment of one site for two seasons due to helicopter logging and the Forest Service disclosed the uncertainty regarding competition with barred owls. AR 13495-97. This Court finds that the Forest Service adequately disclosed the environmental consequence of the project on the northern spotted owl.

ii.  Failure to Disclose Information Regarding Logging in Riparian Reserves

In its FONSI, the Forest Service asserts that "a hard look was taken in deciding whether to commercially thin Riparian Reserves" and noted its reasons for ultimately authorizing the thinning project on 362 acres of Riparian Reserves. AR 15239. The Forest Service's goal of "accelerat[ing] the development of some late successional characteristics" would be "improved with larger tree

Page 14 - OPINION AND ORDER

sizes and increased structural diversity" within those 362 acres. Id.  The Forest Service further noted that conditions of 3,901 acres of Riparian Reserves in the Project area "already met the desired objectives" of the Project, pursuant to the NFP.    Id.

It is on the desired objectives of the NFP that the plaintiffs focus.  Plaintiffs note that the NFP prohibits logging in Riparian Reserves, except to "apply silvicultural practices for Riparian Reserves to control stocking, reestablish and manage stands, and acquire desired vegetation characteristics needed to attain Aquatic Conservation Strategy Objectives."  Pls.' Reply in Supp. of Mot. Summ. J. 10. (quoting SAR 166) (emphasis added).    Plaintiffs maintain that the Forest Service failed to disclose information "demonstrating that Riparian Reserve logging is needed to meet ACS Objectives."  Pls.' Mem. in Supp. of Mot. Summ. J. 20.  Plaintiffs argue that the thinning authorized by the Project actually conflicts with, rather than attains, ACS Objective #8, thus precluding the Forest Service from relying on this exception for logging in Riparian Reserves.[8]

The Forest Service points to a case involving a similar challenge over thinning in Riparian Reserves.    See BARK v. U.S.

---

[8] ACS Objective #8 requires the agency to:

Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands to provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration and to supply amounts and distributions of coarse woody debris sufficient to sustain physical complexity and stability.  SAR 111.

Page 15 - OPINION AND ORDER

Bureau of Land Mgmt., 643 F. Supp. 2d 1214 (D. Or. 2009). There, the plaintiffs challenged the BLM's adherence to the ACS Objectives under both the procedural requirements of NEPA and the substantive requirements of the Federal Lands Policy Management Act ("NFMA").[9] Id. at 1219. The district court nonetheless found that the BLM met its NEPA requirements by adequately summarizing in the EA the consequences of the proposed thinning. Id. at 1231. The Forest Service maintains that BARK compels the same result. The Court agrees.

Here, the Forest Service explained in the EA that "a riparian management strategy ... was specifically developed to accelerate late-successional characteristics." AR 13481. The Forest Service described the characteristics it sought to achieve, including larger diameter trees and large wood to streams, to help provide complex habitat structure. AR 13436. Further, the Project "is designed to leave residual features like live trees, snags, and down woody debris that will add structural diversity and complexity into the future." AR 15238. Addressing the prescribed fuels reduction, the Forest Service added that the "[i]ntroduction of low severity fire... is also anticipated to increase the plant species

_____

[9] In fact, defendants here contend that plaintiffs' argument regarding compliance with ACS #8 is a substantive claim which should have been brought under the NFMA. As the plaintiffs have not claimed a substantive violation of NFMA, however, this Court need only address whether the Forest Service disclosed the environmental consequences of its proposed actions as required by NEPA. For the reasons more fully explained in this opinion, this Court finds that the Forest Service has met NEPA's disclosure requirement and will not address the ACS Objectives as a substantive claim.

and stand structural diversity. At low burn severities, large wood would not be removed from the Reserves." AR 13479. The Forest Service also outlined in the EA and the FONSI how the Project conformed to all nine of the ACS Objectives. AR 13542-45, 15276-77. For example, the Forest Service maintained that those stands within Riparian Reserves slated for thinning would "encourage development of large wood and late successional stand structure." AR 13545.

The Forest Service concedes that "[i]ncreased stand health will reduce snag and dead wood recruitment in the individual treated stands; however, approximately 9,861 acres of stands that have not received timber management will continue to have environmental stressors influencing their stand development." AR 15239. However, the Forest Service described mitigating measures to reduce the impact on Riparian Reserves, including "[n]o-harvest and no-treatment buffers on all streams... to minimize effects to aquatic species and their habitat." AR 13481-82. "All perennial streams (Class 1, 2, and 3) are provided with at least a 60 foot no-harvest buffer to retain effective stream shade." AR 13472. In addition, trees from within these buffers will continue to contribute to the in-stream habitat. AR 13479.

Thus, this Court finds that the Forest Service has disclosed the effects of the Project on Riparian Reserves as required by NEPA and declines to address any substantive claim based on the Project's adherence to the ACS Objectives.

The foregoing discussion explains that the Forest Service

provided a reasonably thorough analysis, adequately supported by materials in the administrative record, of the effects and consequences of the Project on the northern spotted owl and within Riparian Reserves.    Therefore, plaintiffs' motion for summary judgment is denied to the extent that it is based on the Forest Service's failure to follow NEPA's procedural requirements to disclose the environmental consequences of the Project in its EA, and the defendants' and defendant-intervenor's motions are granted in this regard.

II.    <u>Second NEPA Claim: An EIS Is Required</u>

Plaintiffs further assert that the Project proposes action that may significantly affect the environment, thus triggering NEPA's requirement that the Forest Service prepare an EIS.

A.    <u>EIS Requirement</u>

NEPA requires all government agencies to prepare an EIS when a proposed federal action may "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).    Importantly, the significant effect need not actually occur; it is sufficient to trigger the preparation of an EIS if a substantial question is raised "whether a project may have a significant effect on the environment." <u>Blue Mountains Biodiversity Proj. v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998).    If an agency moves forward without issuing an EIS, the agency must provide a "convincing statement of reasons" to support why the proposed project is not significant; this explanation is critical in demonstrating that the agency took the requisite "hard look" at the potential effects of

Page 18 - OPINION AND ORDER

a project.  Id.

     B.   Analysis

    The Forest Service evaluated the potential effects of the Project and concluded that it would not have a significant effect on the human environment; therefore, the Forest Service argues an EIS for the Project is not required by NEPA.

    In assessing a project's significance, both its context and intensity are evaluated.  40 C.F.R. § 1508.27.  The context varies depending on the scope of the project.  Id.  The intensity, or the "severity of the impact" of the proposed action, should be evaluated based on a number "significance" factors.[10]  See 40 C.F.R. § 1508.27(b)(1)-(10).  A court may find a substantial risk of a significant effect based on just one of these factors.  Ocean

---

    [10]The following factors are considered in evaluating intensity:

> (1) Impacts that may be both beneficial and adverse.
> (2) The degree to which the proposed action affects public health or safety.
> (3) Unique characteristics... such as proximity to ... park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
> (4) The degree to which the effects... are likely to be highly controversial.
> (5) The degree to which the possible effects... are highly uncertain or involve unique or unknown risks.
> (6) The degree to which the action may establish a precedent for future actions.
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.
> (8) The degree to which the action may adversely affect [places/structures] listed in or eligible for listing in the National Register of Historic Places.
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat.
> (10) Whether the action threatens a violation of Federal, State, or local law. 40 C.F.R. § 1508.27

Page 19 - OPINION AND ORDER

Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865 (9th Cir.
2004).  Plaintiffs argue that several of these significance factors
weigh in favor of the preparation of an EIS for the Project.

First, plaintiffs point to the "unique characteristic" of the
Project area and its proximity to the "ecologically critical areas"
of potential wilderness and Riparian Reserves.    40 C.F.R.  §
1508.27(b)(3).  The administrative record shows, and the defendants
do not dispute, that the Project would reduce the 9,664 acre
Lookout Mountain PWA by 1,249 acres; 680 acres would be harvested
and an additional 569 acres would be fragmented from the rest of
the PWA.  AR 13518.  "Visible evidence of the management actions
would not substantially alter the PWA but would be evident to the
casual observer walking through or adjacent to the units for
approximately fifty to sixty years."  Id.

In addition to the number of acres being logged, the Project
authorizes construction of eight miles of temporary road and one
mile of permanent road.  The Forest Service, in its FONSI, notes
that the road would be built in part to help minimize costs of the
harvest activity and to provide fire access to the area, adding
that the road would be gated and closed to the public after its
use.  AR 15240.

Plaintiffs argue that the Ninth Circuit has found logging in
roadless areas "environmentally significant" for two reasons: 1)
"their potential for designation as wilderness areas"; and 2) the
nature of the roadless area itself.  Lands Council v. Martin, 529
F.3d 1219, 1230 (9th Cir. 2008).  "Those attributes, such as water

resources, soils, wildlife habitat, and recreation opportunities possess independent environmental significance." Id. Further, Forest Service regulations provide examples of actions that substantially alter the "undeveloped character" of PWA that would normally trigger the EIS requirement, including "[c]onstructing roads and harvesting timber in an inventoried roadless area where the proposed road and harvest units impact a substantial part of the inventoried roadless area." 36 C.F.R. § 220.5(a)(2)(I).

Defendants rebut the contention that Lands Council is applicable; even after the proposed thinning, the Lookout Mountain PWA would still total 8,435 acres, well above the 5,000 acre threshold for wilderness designation. Defendants also argue that a roadless area slated for some harvest does not trigger the EIS requirement per se, relying on Smith v. U.S. Forest Serv., 33 F.3d 1072, 1079 (9th Cir. 1994).

The Smith court, however, ultimately found that the Forest Service had failed to consider the environmental effects of logging in a 5,000 acre roadless area. Id. The court further noted that "the decision to harvest timber on a previously undeveloped tract of land is an 'irreversible and irretrievable decision' which could have 'serious environmental consequences.'" Id. at 1078 (citation and internal quotations omitted). While this Court agrees that an EIS is not per se required when logging is proposed in PWA, it is persuaded that the substantial decrease in overall acreage of the PWA, coupled with the construction of the permanent road, may have significant consequences to the PWA's unique attributes.

Second, plaintiffs argue that the Project proposes actions that may produce highly uncertain or highly controversial effects. 40 C.F.R. § 1508.27(b)(4), (b)(5). "The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001) (citations and internal quotations omitted). Here, plaintiffs argue more data is required regarding both the habitat competition between the barred and northern spotted owls and the need for logging in Riparian Reserves, themselves "ecologically critical areas."

In support of this argument, plaintiffs point to the administrative record where the Forest Service acknowledges uncertainties of the Project's effects.[11] The Forest Service notes in its BA that "[f]ew empirical studies exist to confirm that habitat fragmentation contributes to increased levels of predation on spotted owls." AR 2754. The Forest Service goes on to add that "[b]ecause there has been no research to quantitatively evaluate the strength of different types of competitive interactions... the particular mechanism by which the two owl species may be competing is unknown." AR 2755.

Plaintiffs maintain that there is significant controversy

---

[11] In addition, plaintiffs cite to the FWS's Revised Recovery Plan for the Northern Spotted Owl and its 2012 Draft EIS on the "Experimental Removal of Barred Owls to Benefit Northern Spotted Owls" in which the agency acknowledges the current uncertainties and the need for ongoing research regarding interspecies competition between the owls.    Pls.' Reply Mem. in Supp. of Mot. Summ. J. 21-22; AR 16348, AR 16350, AR 16424, AR 16593-17025.

regarding the benefits of logging in Riparian Reserves. Highlighting both the pros (development of larger trees and increased stand diversity) and cons (immediate decrease in coarse woody debris, increase to overall stand health), plaintiffs argue that "[t]his is just the type of scientific dispute regarding the effects of the proposed action that should have been addressed through additional research and data collection." Pls.' Reply Mem. in Supp. of Mot. Summ. J. 27.

Defendants counter that NEPA does not require an EIS every time there is *some* uncertainty regarding the potential effects, but only when the effects are "highly" uncertain. Envtl. Prot. Info. Ctr. v. U.S. Forest Serv. ("EPIC"), 451 F.3d 1005, 1011 (9th Cir. 2006). At issue in EPIC was a 578-acre timber sale that would result in the downgrade or removal of 65 acres of spotted owl habitat. Id. at 1010. The court there held that the analysis of the environmental consequences of the project, when considered with the mitigation measures in place and the ongoing monitoring provisions included in the project, met the "hard look" requirement and did not require an EIS. Id. at 1016. The Project here, however, has a much greater scope: 2,100 acres are authorized for logging and almost 500 acres of spotted owl habitat would be downgraded or removed as a result. Further, the FWS recognizes the significant uncertainty regarding the interspecies competition and acknowledged the uncertainty in its BiOp. See, e.g., AR 4852 ("The degree to which predation and competition might pose a threat to the spotted owl was unknown in more provinces than any of the other

threats, indicating a need for additional information.").

Third, plaintiffs argue that an EIS is triggered by the significance factor considering the "degree to which [an action] may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27(b)(9). Here, the FWS concluded in its BiOp that the Project would adversely affect the northern spotted owl, although it would not threaten the continued existence of the species. However, "[a] project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect on the environment." Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1080 (E.D. Ca. 2004) (citation and internal quotations omitted).

In Klamath-Siskiyou, the Forest Service determined that the proposed project would result in the loss of 500 acres of "high and moderate quality nesting/roosting habitat," id. at 1082, and would result in the incidental take of three known northern spotted owl pairs. Id. at 1077. The district court held that the Forest Service's determination that the proposed project was likely to adversely affect the northern spotted owl was, "at a minimum," significant and supported the need for an EIS. Id. at 1081. In combination with other significance factors such as the degree of uncertainty about the potential effects of the project, the district court held the Forest Service in violation of its NEPA duty to prepare an EIS. Id. at 1089.

Here, too, the Forest Service concluded that the Project will likely adversely affect the northern spotted owl. The Project

Page 24 - OPINION AND ORDER

would "downgrade 406 acres and remove 82 acres of existing suitable spotted owl habitat, which consists of nesting, roosting, and foraging habitat." AR 13494. Further, the FWS determined that the Project would cause the "incidental take of two northern spotted owl nest pairs and one resident owl." Id. Similar to Klamath-Siskiyou, the adverse effect on a threatened species, combined with the uncertainty of the actual effects, contribute to this Court's finding that the Project may have a significant effect on the environment.

Finally, plaintiffs argue that the proposed thinning in Riparian Reserves threatens a violation of ACS Objective 8, therefore qualifying the potential effects of the Project significant. Plaintiffs argue that the proposed thinning would, in fact, "retard recruitment of woody debris for proper aquatic function," in direct conflict with the NFP and the ACS Objectives contained within the NFP's SG. Pls.' Mem. in Supp. of Mot. Summ. J. 34.

Defendants maintain that a substantive claim based on the Forest Service's analysis of Riparian Reserve effects should have been brought under NFMA and not the procedural requirements of NEPA. Defendants argue that in order to assert a threatened violation of the ACS Objectives as a "significance" factor warranting an EIS under NEPA, plaintiffs must allege a substantive claim that the Forest Service's EA violates the NFP and NFMA.

As discussed above, this Court found that the Forest Service adequately disclosed the effects of the Project within Riparian

Page 25 – OPINION AND ORDER

Reserves.  However, the fact that the Forest Service disclosed such effects does not necessarily render them insignificant.  As previously noted, logging in Riparian Reserves is generally prohibited by the NFP, with limited exceptions.  The Forest Service relies on the exception that silvicultural practices may be applied when they are "needed to attain Aquatic Conservation Strategy objectives."  SAR 166.  Plaintiffs counter the Forest Service's analysis, arguing that logging will delay the build-up of coarse woody debris, which is "a key component of the Aquatic Conservation Strategy." Pls.' Reply Mem. in Supp. of Mot. Summ. J. 24; AR 13654-65, AR 13670-82.

The Forest Service does not analyze this precise issue in its EA and fails to support the need for logging in Riparian Reserves as necessary to achieve ACS Objective 8.  AR 13544-45 (describing the Project goals of achieving late successional characteristics, but not why those goals are necessary to "supply amounts and distribution of coarse woody debris" to achieve ACS Objective 8).  Given the scope of the Project and the potential effects within ecologically critical Riparian Reserves, this Court may weigh the potential violation of the ACS Objectives as a "significance" factor, among others, in deciding whether an EIS is required.

The Court recognizes the deference afforded to an agency, and when considered individually, none of these significance factors might require an EIS.  However, when considered collectively, they do.  The Project authorizes logging that would reduce the Lookout Mountain PWA by 1,249 acres and includes the construction of a

permanent road, both of which may significantly affect the unique attributes of the PWA. There is uncertainty surrounding the effects of the downgrade and removal of 454 acres of spotted owl habitat authorized by the Project. There is a dispute regarding the efficacy of thinning within Riparian Reserves to achieve ACS Objectives. The Project will likely have an adverse effect on a threatened species and its habitat, even though it is not likely to threaten the continued existence of the species. Finally, the Project may actually prevent the recruitment of coarse woody debris, running counter to the NFP's ACS Objective 8.

When viewed together, this Court is compelled to find that these "significance" factors raise a substantial question as to whether the Goose Project may significantly affect the environment. Accordingly, NEPA requires that the Forest Service prepare an EIS.

## CONCLUSION

The Forest Service's and defendant-intervenors' motions for summary judgment (docs. 25, 30) are GRANTED as to plaintiffs' NEPA claim that the Forest Service failed to disclose information regarding the Goose Project's effects on the northern spotted owl and Riparian Reserves, and DENIED in all other respects. Plaintiffs' motion for summary judgment (doc. 23) is GRANTED as to their NEPA claim regarding the Forest Service's failure to prepare an EIS in light of the potentially significant effect of the Goose Project on the environment, and DENIED in all other respects.

Accordingly, the Forest Service is enjoined from going forward with the Goose Project until an EIS has been prepared. IT IS SO

Page 27 - OPINION AND ORDER

ORDERED.

Dated this _21st_ of March  2013.

Ann Aiken
United States District Judge